I turn to the second case, argued case on the calendar. These are tandem cases in Weston Capital Advisors v. P.T. Bank Motiara. I suppose counsel intend to argue these separately unless they wish to reorganize their time or they've decided to reorganize their time. I think separate arguments would be fine, Your Honor. That's fine. Thank you. May it please the Court, Charles Emanuel for appellants. Is this the case in which the Second Circuit should affirm perhaps the most extreme, destructive, overreaching civil contempt penalties ever granted? Can I just ask you which one you're arguing of the two appeals, if we're going to have separate arguments? This is the main appeal with respect to— The main appeal, not the attorney's fees appeal. Correct. Okay. We've shown six distinct reasons why this is not such a case. First of all, the incorrectly labeled revesting orders have simply gone too far. On the prior appeal in this action, a very, very large contempt sanction, monetary, was upheld. But here, as we've laid out in detail in our brief, something more has happened, and what has happened goes beyond what the Second Circuit, I believe, contemplated as appropriate and sufficient remedies in this case. The Second Circuit stated in its prior opinion that the appellants could return if it became clear that the remedy imposed by the district court was simply reaching too far, too extreme, beyond the capacity of the appellants to fulfill. And that's exactly where we are here. These revesting orders are something that have never, ever in any case, ever been imposed by any court. $450 million in escalating fines proved insufficient, evidently. Correct. So then what's next? The answer is, Your Honor. The answer is jailing Mr. Elijah, isn't it? I don't think so. Why not? Because. I think the judge here was sort of desperately trying to avoid what seems to me the obvious remedy as the next step, which is incarceration for civil contempt. That's another issue that we could address if the time and occasion arises. But here, with the monetary sanction, obviously impossible for fulfillment here. And both sides acknowledge that. Well, I'm puzzled. There's a sort of contradiction, isn't there? It seems to me the most appealing argument, or one of the most appealing arguments that you have, is that these vesting orders overreach because they go well beyond, they confiscate property that is worth well beyond what the original contempt fine was. Isn't that one of the things you're arguing? That's not really the focus of our argument. The overreaching, rather, Your Honor, is simply the extremity of the orders, which are. Well, what makes it extreme? Isn't what makes it extreme that, in your view, there are like a billion dollars worth of assets being confiscated? Yes. We are acknowledging that. And that is part of our contempt. So if there's a billion dollars worth of assets, why is it impossible to pay $3.5 million plus interest plus attorney's fees, about $5 million? Because the assets are not cash assets, nor are they readily liquidatable assets. Nor will anyone lend you a dollar, let alone $3 million, on this purported billion dollars worth of assets. My clients have pursued that angle. They have some potential in that regard. But as of yet, the answer is no. There has not been anything that would remotely approach the satisfaction of what's called for here. So what are you proposing? I mean, what should the district court have done? Just said, well, take a loss. My orders are being ignored. And although by virtue of an order of this court, $3.6 million was erroneously paid, and these folks declined to repay it, you know, it's all over, never mind. Is there something? What do you propose the district court could do? Whether there was something more the district court could do, I simply haven't contemplated. It went very far the last time. But isn't that part of the scenario that we're entitled and the district court is entitled to consider in evaluating whether it was part of his inherent power or pursuant to Rule 70, that he could order the revesting orders that he did? And the district court can consider something further. But the district court cannot reach into a foreign sovereign nation and eliminate a judgment that's on the books in that country. It cannot go into that foreign nation and simply seize the assets of companies located in that foreign nation and completely nullify them, not to satisfy any ---- Didn't those companies appear before the district court here, at least one of them, seeking relief and obtained an order for payment of $3.6 million that was due in order? That was WHAI, which came in originally to seek enforcement. Yes, which the district court found were alter egos of the other participants here. And so those companies came voluntarily before this court system and sought the relief that it obtained erroneously, as it turned out. It's not that the district court reached out over the seas to these companies having had no prior contact with them. So I suggest that it's a bit of a stretch for you to try to characterize this as without reason or any basis. Your Honor, those companies did not come here. It was the district court only that made a ruling that they are all alter egos. Who was the petitioner in the action that obtained the $3.6 million turnover order? WCAI. And didn't the district court find that the other companies and Mr. Liagi were all, that they were all alter egos of Mr. Liagi? Yes, he did. And didn't we affirm that finding? The summary order generally affirmed the determination of the district court. So what is the distinction then between WCAI and the other Western entities? Because those companies did not come to the U.S. Well, they did if they were alter egos of the one that did. That doesn't mean that they came to the U.S. It's simply a determination that under U.S. law purportedly these companies are alter egos of one another. But how about the law of the jurisdiction where those companies were formed and where they operate legally and legitimately and have done so for the past seven years? Could you explain to me why you say that the district court invalidated a judgment of the courts of Mauritius? Because it is handing that judgment over to Bank Mutiara. Obviously, Bank Mutiara. If that judgment is property of an entity that is before the court, putting aside, I mean, there may be questions under the rule about whether this is properly vested or revested in someone else. But if it is property that's before the court and the rule does permit property before the court to be vested in someone else, I don't see how turning a judgment over to someone else constitutes invalidating the judgment. The Mauritian judgment belongs to and was obtained by First Global Funds Limited. That's the entity that holds the Mauritian judgment. WCAI came to the U.S. simply to make collection on that judgment. All right. You've reserved some time. Yes. Mr. Greenwald. Thank you. Mark Greenwald, Quinn Emanuel, Urquhart & Sullivan on behalf of Bank Mutiara. May it please the court. The district court's order was well within its discretion to issue these particular contempt sanctions. They were designed to coerce and to compensate Bank Mutiara. The contempt orders had been affirmed by this court. The escalating fines had been affirmed by this court and continued to accrue until we suggested to the district court that they were not going to serve their purpose and that $400 million had become punitive. How much money are we actually fighting about here, the $3.6 million, the $5.4 million, or the whole $450 million? The escalating fines under the rules would not go to Bank Mutiara. They would go to the court. And so they were meant to compel. They failed, although they are still a fine that is out there that can be collected by the court. So your interest is $5.4 million? Exactly, Your Honor. And these assets were purchased by Mr. Liji for $1 and are worthless to anyone except Bank Mutiara because Mr. Liji is using these entities, these judgments, these bonds, and these companies for a worldwide campaign that he's paying lawyers in Singapore to prosecute. So while these assets are not worth the full amount of the $5 million, they're worth something to Bank Mutiara, nothing to anyone else, which is why they're an appropriate compensatory contempt order. Now, are you relying on Rule 70B or are you relying on the general equitable powers of the court to enforce its orders or both? Both, Your Honor. Certainly Rule 70B for the first order, which is the judgment, which under New York State law is an intangible asset. I mean, Mr. Manuel's wrong. Yeah, but Rule 70B talks – I understand the point that this is an asset that is before the court. Yeah. But Rule 70B talks about the real or personal property, which references back property that already was the subject of a judgment, I would have thought. It may be money as well as other property, but the property that's the subject of the judgment. So is that something that Rule 70B contemplates, that if they don't pay a sum of money, then some other asset that is available in the jurisdiction can be effectively attached? Is that what this rule is talking about? I believe it is. It's sort of a substitute asset to satisfy a judgment, and there's no question that the contempt order is a judgment and that Judge Crotty could use Rule 70B to try and satisfy that judgment, which is what he's trying to do here with these three orders, which are also meant to be coercive. But the judgment didn't require a party to convey land, deliver a deed, or other document, the initial contempt order. And that's what Rule 70A refers to, right? Yes. That's correct. So it's not a usual use, but the courts have held that Rule 70 can be used to convey money in extraordinary cases. You said you referred to, you cite Nyquil, I guess, a southern district case. But, of course, Nyquil found that the extraordinary circumstances were not present there. Have you found any other instance? No, Your Honor. So we're relying on that sort of dicta in Nyquil. But the idea is clear in that we can always step back to the inherent powers of the court with parties over whom it has personal jurisdiction. I must admit I'm inclined to, if I had to guess at the value of these assets, I would guess a value closer to $1 than to $1 billion. But I'm not supposed to guess about things like that. Was it not incumbent on the district court to make some assessment of the value of the assets in question to determine whether they were proportionate to the amount of the judgment in question? Well, the district court had already received significant evidence when it issued the original expanded contempt order, including a hearing with live witnesses, and there had been discovery into these entities and their assets. So the district court was familiar with the entities, their claims, and the arguments had made clear that it's only claims, not to mention an ex parte submission by the appellant in this case about their financial position. So the district court certainly had sufficient information to understand that the assets' worth would be compensatory if the third order conveying the equity interest came to fruition. Although, remember, the district court gave Weston 21 days in between each to even make a partial payment, and it did nothing. But even these judgments, I'm not sure what they're worth. I mean, they're worth nothing. They can't enforce them anyplace. There was no personal jurisdiction over Bank Mudiara in Mauritius when they were sought. And also Mr. Manuel says that somehow Mauritius is being invaded. Weston sold first global, obtained the judgment. They sold it to WCAI so that WCAI could prosecute it. Obviously judgments can be sold, can be alienated, and there's nothing about Mauritius that says Judge Crotty can't order a party to deliver that judgment to its debtor. Am I right in understanding that the revestments have in fact happened? So we submit they have as a matter of law. We were waiting until this court ruled. And, you know, it's an interesting question whether Mr. Manuel can even represent the companies here because this court denied his motion to stay. And so technically our client, for the purposes of U.S. law, owns these companies, and he should only be representing Mr. Ligi. But we didn't press that argument to give this court the opportunity to fully review Judge Crotty's order, which we recognize is not usual, but this is simply not a usual case where $400 million in escalating fines failed to compel compliance with a simple order to return money. Following up on a question of Judge Lynch earlier to opposing counsel, did the district court ever consider personal confinement as a way of coercing the enforcement of its order? So we have never sought personal confinement because our concern is that that simply won't work. And we just want to end that if we're not going to get back the money, at least let us try and stop the cases being prosecuted by Westin in Singapore and elsewhere in the world. And so that was our goal. That would compensate Bank Mudiara better than Mr. Ligi languishing in jail and continuing to thumb his nose at the court. Now, the district court ordered revestment, and your opposing counsel told us that this was an unprecedented act. Can you address that question? I mean, it's not unprecedented for a district court to order a party over whom it has personal jurisdiction to deliver property to another party. That happens all the time. We were using the language of the rule, of Rule 70, to vestment, revestment. But the nomenclature is not important. What is important is Judge Crotty, within his discretion, acted appropriately to convey the property of the contenders over whom he had personal jurisdiction to try and coerce and compensate as he was entitled to do. Unless the court has any questions, we'll rest in our brief. Thank you. Mr. Manuel has reserved three minutes. Thank you. First of all, there was a reference to the fact that the original judgment was purchased for $1. This is not at all uncommon in this world. There are many, many firms globally, some of them very, very large, that are in the business of dealing in distressed assets. They do these kinds of things, and they serve a valuable function in the business community globally. They keep the bad guys at least a little bit honest. They can't walk away with tens or hundreds of millions of dollars of money that was borrowed or invested and simply escape untarnished. I'm not questioning the value of the function. The issue is what is the actual value of these judgments, and at least somebody was willing to take $1 for them. And it's $1 for the judgment. Is there any other evidence of the actual market value or cash value of these judgments? There is evidence because we are, in fact, pursuing them worldwide. These judgments are not the only assets of Weston, by the way. There are other similar assets that we are realizing upon. Weston went in with its eyes open. You don't just pay $1. On the one hand, you say that, and that's very compelling when you're focused on an order that says the entire assets, the entire equity of these entities are going to be delivered to Bank Mudiara, and it's not clear to me what those assets even are. And you're telling me, well, there's a lot. But if there's a lot, why can't some of them be diverted to pay back the $5 million that's owed to Bank Mudiara? Your Honor, you're exactly right, and I think I spoke insufficiently. Weston is actively pursuing this around the globe. As Mr. Greenwald mentioned, we have proceedings in Singapore. There are related proceedings in Cyprus. There are proceedings in London. All of it directed to this criminal enterprise. How is that being financed? You're paying lawyers in three continents to pursue these assets, but you can't pay back $3 million. We are very seriously underpaying lawyers on several continents, Your Honor, and I think I'm— And you have a bargain apartment at Trump Towers, too. Your Honor— It's being paid. The operating costs of this enterprise do not remotely approach what it costs similar companies to pursue these matters. I have been at that apartment. That is, for all practical purposes, a workstation and a very active workstation, at least when I have been there. This is not some luxury affair, and the idea of paying for an apartment in New York is by no means beyond what's appropriate. But I'd like to address—I'd like to continue my thought with respect to— No, I'm not going to let you continue your thought. You're going to listen to me when I interrupt. Okay. Thank you very much. Thank you, Your Honor. And you'll come up on the next case.